## KOIS *v.* WISCONSIN

No. 71–5625.   Decided June 26, 1972

PER CURIAM.

Petitioner was convicted in the state trial court of violating a Wisconsin statute prohibiting the dissemination of "lewd, obscene or indecent written matter, picture, sound recording, or film."   Wis. Stat. § 944.21 (1)(a) (1969).   He was sentenced to consecutive one-year terms in the Green Bay Reformatory and fined $1,000 on each of two counts.   The Supreme Court of Wisconsin upheld his conviction against the contention that he had been deprived of freedom of the press in violation of the Fourteenth Amendment.   51 Wis. 2d 668, 188 N. W. 2d 467.

Petitioner was the publisher of an underground newspaper called Kaleidoscope.   In an issue published in May 1968, that newspaper carried a story entitled "The One Hundred Thousand Dollar Photos" on an interior page.   The story itself was an account of the arrest of one of Kaleidoscope's photographers on a charge of pos-

session of obscene material. Two relatively small pictures, showing a nude man and nude woman embracing in a sitting position, accompanied the article and were described in the article as "similar" to those seized from the photographer. The article said that the photographer, while waiting in the district attorney's office, had heard that bail might be set at $100,000. The article went on to say that bail had in fact been set originally at $100, then raised to $250, and that later the photographer had been released on his own recognizance. The article purported to detail police tactics that were described as an effort to "harass" Kaleidoscope and its staff.

*Roth* v. *United States,* 354 U. S. 476 (1957), held that obscenity was not protected under the First or Fourteenth Amendments. Material may be considered obscene when "to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest." 354 U. S., at 489. In enunciating this test, the Court in *Roth* quoted from *Thornhill* v. *Alabama,* 310 U. S. 88, 101–102:

> "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully *all matters of public concern* without previous restraint or fear of subsequent punishment. The exigencies of the colonial period and the efforts to secure freedom from oppressive administration developed a broadened conception of these liberties as adequate to supply the public need for *information and education with respect to the significant issues of the times. . . ."* (Emphasis supplied.)

We do not think it can fairly be said, either considering the article as it appears or the record before the state

court, that the article was a mere vehicle for the publication of the pictures. A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication, but if these pictures were indeed similar to the one seized—and we do not understand the State to contend differently—they are relevant to the theme of the article. We find it unnecessary to consider whether the State could constitutionally prohibit the dissemination of the pictures by themselves, because in the context in which they appeared in the newspaper they were rationally related to an article that itself was clearly entitled to the protection of the Fourteenth Amendment. *Thornhill* v. *Alabama, supra*. The motion for leave to proceed *in forma pauperis* and the petition for writ of certiorari are granted. The conviction on count one must therefore be reversed.

In its August 1968 issue, Kaleidoscope published a two-page spread consisting of 11 poems, one of which was entitled "Sex Poem." The second count of petitioner's conviction was for the dissemination of the newspaper containing this poem. The poem is an undisguisedly frank, play-by-play account of the author's recollection of sexual intercourse. But, as the *Roth* Court emphasized, "sex and obscenity are not synonymous. . . . The portrayal of sex, *e. g.,* in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press." 354 U. S., at 487. A reviewing court must, of necessity, look at the context of the material, as well as its content.

In this case, considering the poem's content and its placement amid a selection of poems in the interior of a newspaper, we believe that it bears some of the earmarks of an attempt at serious art. While such earmarks are not inevitably a guarantee against a finding of obscenity, and while in this case many would conclude

that the author's reach exceeded his grasp, this element must be considered in assessing whether or not the "dominant" theme of the material appeals to prurient interest. While "contemporary community standards," *Roth* v. *United States*, 354 U. S., at 489, must leave room for some latitude of judgment, and while there is an undeniably subjective element in the test as a whole, the "dominance" of the theme is a question of constitutional fact. Giving due weight and respect to the conclusions of the trial court and to the Supreme Court of Wisconsin, we do not believe that it can be said that the dominant theme of this poem appeals to prurient interest. The judgment on the second count, therefore, must also be reversed.

*Reversed.*

MR. JUSTICE STEWART concurs in the judgment.

MR. JUSTICE DOUGLAS, concurring in the judgment.

I concur in the judgment because neither logic, history, nor the plain meaning of the English language will support the obscenity exception this Court has engrafted onto the First Amendment.

This case, moreover, is further testimony to the morass in which this Court has placed itself in the area of obscenity. Men are sent to prison under definitions which they cannot understand, and on which lower courts and members of this Court cannot agree. Here, the Court is forced to examine the thematic content of the two newspapers for the publication of which petitioner was prosecuted in order to hold that they are constitutionally protected. Highly subjective inquiries such as this do not lend themselves to a workable or predictable rule of law, nor should they be the basis of fines or imprisonment.

In this case, the vague umbrella of obscenity laws was used in an attempt to run a radical newspaper out of

business and to impose a two-year sentence and a $2,000 fine upon its publisher. If obscenity laws continue in this uneven and uncertain enforcement, then the vehicle has been found for the suppression of any unpopular tract. The guarantee of free expression will thus be diluted and in its stead public discourse will only embrace that which has the approval of five members of this Court.

The prospect is not imaginary now that the Bill of Rights, applicable to the States by reason of the Fourteenth Amendment, is coming to be a "watered down" version, meaning not what it says but only what a majority of this Court thinks fit and proper.